UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JAYSON VREELAND,                    :
                                   :     Civil Action No. 11-5239 (JAP)
              Petitioner,          :
                                   :
       v.                          :     **OPINION**
                                   :
CHARLES WARREN, et al.,            :
                                   :
              Respondents.         :

**APPEARANCES:**

**JAYSON VREELAND**, Petitioner pro se
404218
New Jersey State Prison
P.O. Box 861
Trenton, N.J. 08625

**LAURA LILLIAN NAZZARO**, Counsel for Respondents
Sussex County Prosecutor's Office
19-21 High Street
Newton, N.J. 07836

**PISANO**, District Judge

       Petitioner Jayson Vreeland ("Petitioner"), a prisoner currently confined at New Jersey

State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254.   The respondents are Administrator Greg Bartkowski, the Attorney General

of New Jersey and the Sussex County Prosecutor's Office.   For the reasons stated below, the

Petition will be denied.

**I. BACKGROUND**

       This Court, affording the state court's factual determinations the appropriate deference, *see*

28 U.S.C. § 2254(e)(1)[1], will simply reproduce the recitation of facts as set forth by Superior Court

of New Jersey, Appellate Division on direct appeal:

> After burglarizing a sporting goods store and stealing firearms therefrom, Koskovich [Petitioner's separately-tried co-conspirator] gave a .40 caliber handgun to Michael Conklin, his co-conspirator in that burglary and theft, and told Conklin that he was planning to rob "some pizza men, holding them up…for the money." Conklin agreed to participate and continued to do so, even after Kosovich changed his plan to "hold up pizza men in Vernon, shoot them and take their money and their car." Subsequently, Koskovich met with Conklin and defendant, although the plan was not discussed at the time. Nevertheless, at some time thereafter, Koskovich told Conklin that defendant would participate in the crime. On cross-examination, Conklin testified that Koskovich "never indicated" that defendant agreed to be involved prior to its occurrence.

> Nevertheless, before the crimes occurred, defendant participated with Koskovich in taking target practice with the stolen guns. Koskovich also spoke with defendant about his plan to rob and kill a pizza deliveryman. He explained that pizza men were "an easy target." According to defendant's subsequent recorded statement to the police, Koskovich indicated that he wanted to "kill someone…just for the thrill of killing someone."

> On the morning of April 19, 1997, Koskovich went to Conklin's home and told Conklin that he was going to commit the murder that night. Conklin made himself unavailable to participate in the crime.

> Defendant arrived at Koskovich's home between 6:30 and 7:00 that evening. They drove to Conklin's house in Koskovich's car, a light blue 1984 Chevrolet Cavalier. The car was "loud" and one headlight was not working. They returned to Koskovich's home after discovering that Conklin was not home.

> While there, Koskovich's girlfriend, Kimberly Prestidge, saw defendant tear a list of pizza restaurants out of the telephone book, and saw either defendant or Koskovich copy telephone numbers onto a piece of paper. She also saw both defendant and Koskovich put guns in their belts or under their shirts.

> On the evening of April 19, 1997, Scott Madden was working in the garage of his residence on Scott Road in Franklin Township when he heard a vehicle traveling

---

[1]Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

by.  Madden, an automobile parts employee for General Motors, observed a light blue Chevrolet Cavalier hatchback drive past his house and, twenty minutes later, return in the opposite direction.   Due to its hatchback design, Madden was able to identify the vehicle as manufactured between 1984 and 1987.   Madden further testified that he was able to easily hear the vehicle because "it had no muffler or [had] a hole in the muffler."   Another Scott Road resident, Claudia Simet, confirmed Madden's report.   She testified that she heard a "loud car" pass her house between 9:00 and 9:30 p.m. and observed that the vehicle had one burned out headlight.   Both accounts buttressed defendant's statement in which he referred to an abandoned house on Scott Road as the place where he and Koskovich planned to have the pizzas delivered.

Defendant and Koskovich were observed at a Dunkin' Donuts in Franklin between 9:00 and 11:00 on the evening of April 19.   Koskovich obtained a telephone book, and defendant began calling pizzerias to place an order.   Defendant first called Tony's Pizzeria, but terminated the call after discovering Giordano – a person who he knew and was once "pretty close" with – was working that night.   Defendant and Koskovich then took turns placing calls to other pizzerias.   Ultimately, Tony's Pizzeria was called a second time.   Defendant and Koskovich ordered two pizzas to be delivered to an abandoned house on Scott Road.   Gallara, the owner of Tony's restaurant, took the call and accepted the order.   The cook started to prepare pies at approximately 10:30.   Giordano and Gallara left to deliver the order at about 10:45.

Between 10:00 and 11:00 p.m., Harriet Yonkers looked out the window of her home on Scott Road after hearing a car with a bad muffler, and saw a blue car with one burnt out headlight parked across the street from her home.   She observed both the driver and passenger get out of the vehicle.

According to defendant's statement, when the pizza delivery was made to the abandoned house on Scott Road, Koskovich "just started shooting" through the open passenger window of the victims' car.   Koskovich shot the driver in the head causing what defendant described as a "huge hole."   According to defendant's statement, Koskovich also fired at the passenger and defendant picked up his gun from the grass where it had been placed and began to fire at the dashboard of the car because he "just wanted…to prove that…[he] was a friend of Koskovich."   He said he "didn't want to kill anybody" and had "pretty much more or less [shot] towards the dashboard."   However, in his prior oral statement to the police, defendant said he pulled out his gun and began firing at the same time that Koskovich did.   Defendant fired four shots.   Thereafter, Koskovich pulled Gallara from the car, and defendant realized that Giordano was the driver of the delivery vehicle.   At about 11:30 p.m., Ms. Yonkers heard noises and observed the loud vehicle drive away from the scene at a fast rate of speed.

Defendant and Koskovich returned to Koskovich's home and changed from their

3

bloody clothes.  Ms. Prestidge testified that the two returned between 11:15 and 11:20 and looked "pretty wrecked."   According to defendant's statement, Koskovich made phone calls to his friends asking "have you ever talk[ed] to someone that just murdered someone."

On April 20, 1997, Madden observed the car he had seen on Scott Road the day before and called the police with identification.  Koskovich was arrested by the State Police and on April 21, 1997, a search was conducted of his residence pursuant to a warrant issued by a judicial officer.   Among the items retrieved were firearms, Gallara's wallet, and a gym bag containing blood stained clothes.

Defendant was subsequently arrested pursuant to a separate warrant.  Because defendant was a juvenile his parents were invited to be present during an interview, and defendant's parents agreed to do so because they wanted him to cooperate and tell the truth.   After being advised that defendant did not have to answer questions and that his parents had the right to be present, defendant told the police "he had no problem with talking to…[them] but he wanted to be interviewed.   He was read his Miranda rights, and defendant and his parents both signed a Miranda waiver form. Defendant's parents also signed a form granting the police permission to interview defendant and opting to be present during the interview.  In his oral statement, defendant acknowledged that "we both shot into the car."

After the oral statement was complete, the police asked for the opportunity to tape the statement, and defendant and his parents once again agreed.  The Miranda warnings were administered a second time.   In the recorded statement defendant stated, among other things, that he had placed his gun in the grass and had to retrieve it after Koskovich began shooting.   As already noted, in the taped statement defendant said he shot at the dashboard.

Subsequent to his arrest and the statements, defendant was placed in the Sussex County Juvenile Detention Center.   There he told another detainee, Charles Varella, that he never thought that the events would occur or that Koskovich would go through with the plan, which included making the telephone calls from Dunkin' Donuts and shooting the delivery person or persons at an abandoned house. Defendant told Varella that he fired a .22 caliber shotgun into the dashboard of the delivery vehicle.   He also told Varella that he and Koskovich wanted to see "[w]hat it was like to kill somebody."

The DNA analysis revealed that Giordano's blood matched the blood stains on the pants found inside a bag which was retrieved outside of Koskovich's home during the search.   The State Police expert testified that Giordano was shot by a .45 caliber pistol but could not conclusively indicate whether bullets that killed Gallara came from the .22 caliber firearm.   No damage was found on the passenger side dashboard of the delivery car.

4

Dr. Paula Bortnichak, a psychologist, testified that defendant became dependent upon Koskovich and had a submissive relationship.   Defendant viewed Koskovich as "charismatic" and a "powerful leader."   Defendant told her that while they were at Dunkin' Donuts, Koskovich devised the plan that they would call pizza restaurants, have pizza delivered and hold up the delivery person.   Defendant indicated that Koskovich never discussed the plan to shoot the delivery person. The doctor was also told that after Koskovich began shooting, he yelled to defendant "you got to do this with me," and that he decided to shoot at the dashboard.   He also indicated that Koskovich gave him two blue Fioricet pills after the shooting.   Dr. Bornichak concluded that defendant's cognitive ability at the time of the shooting was "reduced somewhat so that he could not have the full capacity to participate in…[a] knowing and purposeful way."   This was a result of his psychological dependence on Koskovich, his barbiturate intoxication and the impairment of his cognitive capacity caused by his witnessing of Koskovich's shooting.   However, Dr. Bortnichak also indicated that defendant had the capacity to know that the "holdup would take place" and that he was "able, in a purposeful or knowing way to accept the gun from" Koskovich.   Moreover, she recognized that there were discrepancies between defendant's statements and the version he told her and that she relied upon the latter.   An expert called by the state concluded that defendant acted purposefully and knowingly.

*State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).

After a jury trial, Petitioner was found guilty of purposeful or knowing murder of Gallara, felony murder of Gallara, aggravated manslaughter of Giordano, first degree robbery, second degree burglary, conspiracy, possession of a firearm for an unlawful purpose, and possession of the firearm without a permit.   *State v. Vreeland*, 2010 WL 2990937, at *1 (N.J. Super. Ct. App. Div. July 26, 2010).   Petitioner was acquitted of the purposeful or knowing murder of Giordano and of hindering apprehension.   *Id.*   Petitioner was sentenced to life imprisonment with thirty years to be served before parole eligibility for the purposeful or knowing murder of Gallara, a consecutive sentence of twenty years, with ten years to be served before eligibility, for the aggravated manslaughter, and consecutive sentences for the armed robbery, burglary and permit convictions aggregating life imprisonment plus forty-six years with fifty-one years to be served

before parole eligibility.   *Id.*   Petitioner appealed and the Appellate Division affirmed the convictions, and the consecutive sentences for the two homicides and armed robbery, but ordered the remaining terms to be served concurrently.   *State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).   On May 3, 2005, the New Jersey Supreme Court denied certification. *State v. Vreeland*, 874 A.2d 1104 (N.J. 2005).

Petitioner filed a petition for post-conviction relief ("PCR"), which was denied by the trial court and then by the Appellate Division.   *State v. Vreeland*, 2010 WL 2990937, at *1 (N.J. Super. Ct. App. Div. July 26, 2010).   The New Jersey Supreme Court denied certification.   *State v. Vreeland*, 12 A.3d 209 (N.J. 2011).   On May 27, 2011, Petitioner filed the instant petition.   (ECF No. 1.)   He alleges a claim of ineffective assistance of counsel, based on the following grounds: (1) trial counsel failed to protect Petitioner's right to testify at the jurisdictional waiver hearing; (2) trial counsel failed to protect Petitioner's right to be present in court during the jury charge conference; (3) trial counsel failed to call witnesses to impeach Charles Varella's credibility; (4) trial counsel failed to object to the trial court's instructions on motive; and (5) appellate counsel failed to raise the issue of the trial court's improper denial of Petitioner's change of venue motion. Petitioner also alleges that his due process rights were violated by the following: (1) his co-conspirator's statements were improperly admitted in violation of the Sixth Amendment confrontation clause; (2) Petitioner was improperly absent from the charge conference in violation of his Sixth Amendment rights; (3) the trial court failed to properly charge the jury regarding Petitioner's out-of-court statements and the testimony of Varella and Conklin; (4) Petitioner's cross-examination of the medical examiner was improperly limited; (5) the trial court improperly allowed the jury to have a tape player to listen to Petitioner's taped statement; (6) the prosecutor

made improper comments during the summation; and (7) the conviction for burglary should have merged into the robbery conviction and the sentences imposed were excessive.[2]  *Id.*

Respondents filed an answer, arguing that Petitioner is not entitled to habeas relief.   (ECF Nos. 15-18.)   Petitioner did not file a reply.

## II. DISCUSSION

### A. Legal Standard

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

...

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the

---

[2] With respect to Petitioner's claims regarding his PCR petition, including ineffectiveness of PCR counsel and failure to conduct an evidentiary hearing, the Court notes that Petitioner has no federal right to an evidentiary hearing or other relief denied by a state PCR court: infirmities in a state PCR proceeding do not raise constitutional questions in a federal habeas action.  *See Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir.1998) ("what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation").   Since errors in Petitioner's state PCR proceedings, even if presumed present, were collateral to his conviction and sentence, they could not give rise to a claim for federal habeas relief.  *See Hassine*, 160 F.3d at 954.  *See also* 28 U.S.C. § 2254(i).   Therefore, Petitioner's challenges based on denial of an evidentiary hearing and ineffectiveness of PCR counsel are necessarily subject to dismissal for failure to assert a violation of his federal rights.

facts in light of the evidence presented in the State court proceeding....

28 U.S.C. § 2254.

"As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).   Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." *Id.*   A federal court's authority to grant habeas relief is further limited when a state court has adjudicated petitioner's federal claim on the merits.[3]   *See* 28 U.S.C. § 2254(d).   If a claim has been adjudicated on the merits in state court proceedings, this Court "has no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   *Parker v. Matthews*, 132 S.Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)).   However, when "the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply."   *Lewis*, 581 F.3d at 100 (quoting *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly

---

[3] "[A] claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground." *Lewis v. Horn*, 581 F.3d 92, 100 (3d Cir. 2009) (quoting *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009)).   "Section 2254(d) applies even where there has been a summary denial." Cullen, 131 S.Ct. at 1402.   "In these circumstances, [petitioner] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state court's] decision."   *Id.* (quoting *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)).

established by the Supreme Court. *See Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." *Parker*, 132 S.Ct. at 2155 (quoting 28 U.S.C. § 2254(d)(1)).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" *Williams*, 529 U.S. at 405–06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. However, under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington*, 131 S.Ct. at 785 (quoting *Williams* at 410). As the Supreme Court explained,

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.... Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington*, 131 S.Ct. at 786 (citations and internal quotation marks omitted).

9

"This is a difficult to meet, and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Cullen*, 131 S.Ct. at 1398 (citations and internal quotation marks omitted).   The petitioner carries the burden of proof, and review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits.   *Id.*

**B.   Analysis**

**1.   Ground Two: Due Process**

**a.   Co-Conspirator's Statements**

Petitioner argues that his due process rights and Sixth Amendment right to confrontation were violated when the trial court improperly permitted the admission of Conklin's testimony regarding Koskovich's statements to him that Petitioner would participate in a plan to rob and shoot pizza delivery men.   In his direct appeal, Petitioner argued that the admission of that testimony under the co-conspirator hearsay exception was improper since the court failed to determine whether a conspiracy actually existed before permitting the testimony.

The Appellate Division rejected this claim on direct appeal, stating:

Defendant argues that he was denied his right of confrontation and that evidence was unlawfully admitted against him under the co-conspirator exception to the hearsay rule.   Over objection, the trial judge permitted Conklin to testify that Koskovich told him defendant would participate in the plan to rob and shoot the pizza deliveryman.   However, defendant contends that "the record does not show that Koskovich's alleged statement to Conklin implicating the defendant in a conspiracy to rob and shoot the pizza deliverymen occurred prior to the crime." Therefore, defendant asserts that the statements were not made "in furtherance of and during the course of the conspiracy."   Defendant further argues that the admission of this hearsay testimony cannot be deemed "harmless because it was offered to undercut his defense based upon the inability to form the necessary culpability to sustain a purposeful or knowing murder conviction."

On his direct testimony, Conklin indicated that Koskovich told him that he and

10

defendant "wanted to hold up pizza men and shoot them and then take their money and their car." On cross-examination, however, Conklin also testified that Koskovich "never indicated to [him anything about] Mr. Vreeland being involved" "prior to the commitment of this crime …."

In order to be admissible under N.J.R.E. 803(b)(5): (1) "the statement must have been made in furtherance of a conspiracy"; (2) "it must have been made during the course of the conspiracy"; (3) "there must be evidence, independent of the hearsay, of not only the conspiracy but also defendant's relationship to it." The State bears the burden of proving that these prerequisites to admissibility have been met by a "fair preponderance of the evidence." [*State v. James*, 346 N.J. Super. 441, 457-59 (App. Div.), *certif. denied*, 174 N.J. 193 (2002) (citing *State v. Phelps*, 96 N.J. 500, 509-10, 517-19 (1984)).]

However, "a statement is considered to have been made in the course of a conspiracy even when the crimes have been completed as long as all of the conspiracy's objectives and goals have not yet been met." *State v. Soto*, 340 N.J. Super. 47, 62 (App. Div.), *certif. denied*, 170 N.J. 209 (2001). *See also State v. Hunt*, 115 N.J. 330, 367-68 (1989).

The record reveals no clear finding that Koskovich's statement to Conklin about defendant's role was made before the shootings occurred. However, it is illogical for Koskovich to have sought Conklin's participation in the conspiracy after the shootings had already occurred. Furthermore, it is inconceivable that the conspiracy ended the moment the shootings, burglary and robbery were completed, and before Koskovich was arrested because the defendants remained together after the shooting and mutually engaged in activity to hinder apprehension. Accordingly, there is support for admission of the testimony regardless of the judge's determination of the timing of the statement. Nevertheless, no instruction was given to the jury, as required, with respect to its obligation to find independent evidence of a conspiracy before it could consider that testimony substantively. *See State v. Phelps*, *supra*, 96 N.J. at 520.

We need not determine whether Conklin's testimony was admissible as a statement in furtherance of a conspiracy, however, because we are more than satisfied that, even if a hearsay violation occurred, it was harmless beyond a reasonable doubt. The case against the defendant was extraordinarily strong and included defendant's oral and taped statement to the police, as well as a statement to Varella, in which defendant confessed to his actual participation in the crimes and shootings themselves. There was also strong corroborative evidence by virtue of the observations of Ms. Prestidge, who saw the defendant tear a list of pizza restaurants from a telephone book on the night in question and who observed defendant and Koskovich place firearms in their belts before leaving the home, and Koskovich's car with one headlight missing and a loud muffler was observed at the crime scene on Scott Road. Moreover, before the crime occurred, defendant and Koskovich

were observed at the Dunkin' Donuts where they obtained a telephone book from the manager and took turns calling various pizzerias. Furthermore, defendant expressly acknowledged at trial, and at the argument before us, that he was at the scene of the killings and fired a gun. In light of all of this testimony, the introduction of any inadmissible hearsay statement must be deemed harmless beyond a reasonable doubt.

We recognize that defendant's principal argument relates to the proofs concerning his purposeful or knowing state of mind or culpability required to commit a murder and that Conklin's testimony undermines the defense that he had no intention or plan to kill anyone as well as defendant's claim that he fired only at the dashboard. But independent of the fact that he was convicted of the aggravated manslaughter of Giordano and the felony murder of Gallara – neither of which need a purposeful or knowing intent to kill or cause serious bodily injury resulting in death – the evidence including defendant's statements to Varella and the police were more than sufficient to sustain purposeful or knowing murder conviction as well as the other convictions. In that connection, we emphasize that the proofs did not have to show that defendant actually fired a fatal bullet. The judge charged the jury on accomplice liability, and the proofs were overwhelming with respect to defendant's purpose to aid Koskovich. Significantly, in her instructions to the jury, the trial judge stated, without objection and without objection before us:

> The indictment charges that Jayson Vreeland is legally responsible for the criminal conduct of Thomas Koskovich in violation of the law which reads in pertinent part as follows: A person is guilty of an offense if it is committed by his own conduct or the conduct of another person for which he is legally accountable or both.
>
> A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of an offense. A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of the offense, he aids or agrees or attempts to aid such other person in planning or committing it.
>
> ….
>
> In this case, the State alleges that the defendant is equally guilty of the murders committed by Thomas Koskovich because this defendant acted as Mr. Koskovich's accomplice with the purpose that the specific crimes charged be committed.
>
> In order to find Jayson Vreeland guilty as an accomplice of Thomas Koskovich, the State must prove beyond a reasonable doubt each of the following elements: First, that Thomas Koskovich committed

the crime of murder of Jeremy Giordano; and second, that this defendant did aid or agree or attempt to aid Thomas Koskovich in planning or committing this offense; and third, that this defendant's purpose was to promote or facilitate the commission of this offense; and fourth, that this defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act.

Remember that one acts purposely with respect to his conduct or as a result thereof if it is his conscious object to engage in conduct of that nature, or to cause such a result.

Aid means to assist, support or supplement the efforts of another. Agree to aid means to encourage by promise of assistance or support.   Attempt to aid means that a person takes substantial steps in the course of conduct designed or planned to lend support or assistance in the efforts of another to cause the commission of a substantive offense.

If you find that the defendant, with the purpose of promoting or facilitating the commission of the offenses, aided or agreed or attempted to aid Thomas Koskovich in planning or committing them, then you should consider him as he committed the crimes himself.

This aspect of the charge did not limit accomplice liability to the shooting of Giordano.   Moreover, defendant's recorded statement included the fact that defendant and Koskovich stopped by the location 'where [Koskovich] wanted to shoot [t]he delivery person before going to Dunkin' Donuts, that defendant called Tony's Pizza "because [he] wanted to see if Jeremy [Giordano] was on" duty because "if this actually did happen…if Tom was actually going to do this, I didn't want it to be Jeremy," and that he participated in ordering the pizza to be delivered by a person to be shot and killed.   The jury could have easily concluded that because defendant expressed a desire not to kill a person he knew, and he initially did not want to involve Giordano because he knew Giordano, defendant did not have the requisite culpability to murder Giordano while he acted with the purpose to assist Koskovich in killing or causing the death of Gallara.   In fact, in his summation defense counsel 'conceded the recklessness of [his] client's act.'

*State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).

The admissibility of evidence is generally a question of state law which is not cognizable on habeas review.   *See Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001); *Hickey v. Jeffes*,

13

571 F.2d 762, 766 (3d Cir. 1978).   However, the Sixth Amendment's Confrontation Clause confers rights that cannot be satisfied merely by meeting the requirements of the rules of evidence. The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."   This guarantee applies to both federal and state prosecutions.   *Pointer v. Texas*, 380 U.S. 400 (1965).

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that the admission at a joint trial of a non-testifying co-defendant's confession which also names defendant as a participant in the crime violates the Confrontation Clause, even when the court gives a limiting instruction.   But in *Richardson v. Marsh*, 481 U.S. 200, 208 (1987), the Supreme Court clarified that the co-defendant's confession or statement must incriminate the defendant on its face to give rise to a *Bruton* violation.[4]

Even assuming that the admission of Koskovich's statement was erroneous, errors under the Confrontation Clause are subject to harmless error analysis.   *See Adamson v. Cathal*, 633 F.3d 248, 259–61 (3d Cir. 2011); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *United States v. Hinton*, 423 F.3d 355, 362–63 (3d Cir. 2005); *Eley v. Erickson*, --- F.3d ----, 2013 WL 1405923, at *18 (3d Cir. April 9, 2013).   Accordingly, this Court must consider whether the limited introduction of Koskovich's statement via Conklin's trial testimony was harmless or whether it resulted in actual prejudice to Petitioner.   *See Brecht v. Abrahamson*, 507 U.S. 619 (1993).   "[A]n error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007).   "If, when all is said and

---

[4] Specifically, the *Richardson* Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when… the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."   *Richardson*, 481 U.S. at 211.

done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight

effect, the verdict and judgment should stand."   *O'Neal v. McAninch*, 513 U.S. 432, 437–38

(1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946)).

Here, this Court finds that the introduction of Koskovich's statement through Conklin's

trial testimony was harmless and had no real influence or actual prejudice to Petitioner.   As stated

by the Appellate Division, Petitioner himself had admitted to the police in his statement and at trial

that he was at the scene of the killings and fired a gun.   Moreover, there was substantial

corroborating evidence regarding his actions, including the observations of Ms. Prestidge;

Koskovich's car being observed at the crime scene on Scott Road; and Petitioner and Koskovich

being observed at the Dunkin' Donuts where they obtained a telephone book from the manager and

took turns calling various pizzerias.

Therefore, based on the overwhelming evidence against Petitioner, this Court concludes

that any error in admitting the statement was harmless, and had little to no injurious or harmful

effect in determining the jury's verdict.   The state courts' decision on this issue was not contrary

to, and did not involve an unreasonable application of, clearly established federal law; nor was it

based on an unreasonable determination of the facts presented in the state court proceedings.

Petitioner is not entitled to habeas relief on this ground.

### b.  Charge Conference

On direct appeal, Petitioner argued that he was not present at the charge conference

conducted by the trial court, in violation of his constitutional rights.   The Appellate Division

denied relief on this claim:

> We find no basis for reversing defendant's conviction merely because defendant
> did not attend the in-camera charge conference.   The on-the-record discussion of
> what occurred in chambers essentially satisfies the requirements of R. 1:8-7 in

these circumstances because both parties had the opportunity to fully develop any disagreements with respect to the judge's statements concerning the charge conference and to put on the record any objections or requests that they felt appropriate thereafter.   As a result, the essence of the charge conference was conducted "on the record," as required by R. 1:8-7(b).   Moreover, defense counsel indicated that defendant did "'not wish to be present during the charge conference."

*State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).

The Appellate Division also addressed this issue again briefly on PCR appeal:

Defendant waived his right to be present at the charge conference. We will assume he has a Sixth Amendment right to presence at the conference, but the lengthy conference related to technical issues discussed over several hours. In any event, we addressed the issue on direct appeal and concluded that as the results of the conference and objections were placed on the record, in open court after the lengthy chambers conference, there was in essence a charge conference on the record in open court, and defendant was not prejudiced. *See* R. 1:8-7; R. 3:22-5.

*State v. Vreeland*, 2010 WL 2990937, at *3 (N.J. Super. Ct. App. Div. July 26, 2010).

An accused's right to be confronted with the witnesses against him requires a "face-to-face" meeting; "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."   *Illinois v. Allen*, 397 U.S. 337, 338 (1970).   Indeed, the right to be present at every critical stage of a trial is a "fundamental right of each criminal defendant,"   *Rushen v. Spain*, 464 U.S. 114, 117-118 (1983), which is rooted in both the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments.   *See United States v. Canady*, 126 F.3d 352, 360 (2d Cir. 1997) (citations omitted).   The right to be present at trial is "scarcely less important to the accused than the right of trial itself."   *Diaz v. United States*, 223 U.S. 442, 455 (1912).

Notwithstanding the importance ascribed to this right, it plainly may be waived.   Thus, the Supreme Court has held that a defendant who knowingly absents himself from the courtroom after

16

trial has commenced "leaves the court free to proceed with trial in like manner and with like effect as if he were present." *Diaz*, 223 U.S. at 445. However, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). Whether the waiver of a known right has been intelligently made "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

In this case, at the end of the presentation of evidence, trial counsel informed the court that he was in "the process . . . of discussing with [Petitioner] the charge conference and the fact that that is normally done outside of his presence." (Resp'ts' Br., Ex. 24T, Trial Tr. 186:11-17, Dec. 15, 1999, ECF No. 18-8.) The court then explained to Petitioner that a proposed jury charge had been prepared and it would be provided to counsel at that time so that they could review it overnight. (*Id*. at 18-25.) The court indicated that normally the charge discussions take place in chambers and the objections thereto and the final version of the charge is done on the record. (*Id.* at 187:12-13.). The court explained to Petitioner that he had the "option of saying you wish to be present for the entire charge conference . . . [i]f you wish to do so, we will have the entire conference hear [sic] in the courtroom . . . [w]e will not have the conversations in Chambers as I indicated which we ordinarily do in order to work out language . . . [i]f you want to have it in the courtroom it's perfectly fine with me . . . [t]hat's up to you and [defense counsel] to discuss and decide how you want to deal with that." (*Id.* at 188:1-10.)

The next day, the court asked counsel where they wanted to have the charge conference (Resp'ts' Br., Ex. 25T, Trial Tr. 53:1-16, Dec. 16, 1999, ECF No. 18-9.) Trial counsel, in

17

Petitioner's presence, responded: "Judge, I've discussed the matter with my client.   In Chambers will be fine.   I do not believe that my client wishes – well, I shouldn't phrase it that way.   It's my understanding, Judge, my client does not wish to be present during the charge conference." (*Id.* at 53:21-54:1.)   Petitioner did not object or otherwise indicate that counsel's representations were not correct.   As such, the Court finds that the state courts' decision on this issue was not contrary to, and did not involve an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts presented in the state court proceedings. Petitioner is not entitled to habeas relief on this ground.

### c.  Jury Instructions

Petitioner alleges that his constitutional rights were violated when the trial court failed to instruct the jury that it must disregard Petitioner's out-of court statements if they do not find corroboration.   Petitioner argues that his rights were also violated when the trial court failed to give an instruction about Conklin and Varella's testimony regarding oral admissions.

The Appellate Division rejected this claim on direct appeal:

> We also recognize that the harmless error analysis is affected by defendant's assertions that his oral and taped confession should not have been admitted into evidence without appropriate instructions relating to the jury's obligation to find them credible, *see State v. Hampton*, 61 N.J. 250 (1972), and that the trial judge should have instructed the jury about the reliability of an oral statement as it applied to Varella's testimony as well as defendant's oral statement to the police.   *See State v. Kociolek*, 23 N.J. 400 (1955).   *See also State v. Jordan*, 107 N.J. 404, 428 (1997).   However, the taped conversation was played to the jury and would not be subject to the *Kociolek* instruction, *see Kociolek, supra*, 23 N.J. at 421, and we cannot find that the judge's failure to give a *Hampton* instruction requires reversal in this case, given all of the other evidence in support of a conviction.   *See State v. Jordan, supra*, 147 N.J. at 409, 426-30.

> In this connection, in evaluating the impact of defendant's oral and taped statements for purposes of the harmless error analysis, we further note that defendant's parents were present while they were taken and that the defendant's statement was ultimately tape-recorded and available to the jury.   Moreover,

18

defendant relied upon his statements to the police as a basis for emphasizing his lack of culpability by virtue of the immediacy of his statement with respect to the shooting at the dashboard.

…

Thus, defendant relied upon his oral statements for purposes of asserting his defense and advanced their credibility at least for certain purposes, and he cannot now repudiate them under the plain error rule for failure to request an instruction or object to the instruction that was given concerning those statements.

*State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).

A habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions on the elements of an offense ... must include particular provisions" or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him." *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997). This is because district courts do not "sit as super state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it." *Id. See also Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional right]") (citations and internal quotation marks omitted). As the Third Circuit explained,

In considering whether this case involves a claim of error under the Constitution, laws, or treaties of the United States, it is critical to remember that the Supreme Court has made it clear that the states define the elements of state offenses. Accordingly, while there may be constitutionally required minimum criteria which must be met for conduct to constitute a state criminal offense, in general there is no constitutional reason why a state offense must include particular elements. *See McMillan v. Pennsylvania*, 477 U.S. 79, 84–86, 106 S.Ct. 2411, 2415–16, 91 L.Ed.2d 67 (1986).

…Put in a different way, the jury instructions on justification, even if correct under state law, would need to have relieved the state of the necessity of proving an element of the offense as required by federal law or to have deprived the petitioner

19

of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action.

*Johnson*, 117 F.3d at 110.

"[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71–72. "Insofar as respondents simply challenge the correctness of the self-defense instructions under Ohio law, they allege no deprivation of federal rights and may not obtain habeas relief". *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Petitioner has not alleged any violations which would properly form the basis for habeas relief. Moreover, the state court's decision upholding the instructions was not "contrary to, or ... an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and as such, Petitioner is not entitled to habeas relief on this ground. *See Smith v. Spisak*, 558 U.S. 139, 148-149, 130 S.Ct. 676, 684, 175 L.Ed.2d 595 (2010) (no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); *Dansby v. Trombley*, 369 F.3d 657, 659 (6th Cir. 2010) ("Dansby's [§ 2254] claim fails because the Supreme Court has never held that due process requires the giving of jury instructions on lesser-included offenses in noncapital cases").

### d. Cross-Examination

Petitioner alleges that his Sixth Amendment rights were violated when the trial court improperly limited counsel's ability to cross-examine the medical examiner. The Appellate Division denied this claim on direct appeal:

> Defendant challenges the limitations placed on the cross-examination of the State's medical examiner, Dr. Michael Dunne. Defendant states:
>
>> The jury acquitted defendant of both the first degree murder and felony murder of Jeremy Giordano. They may have relied upon Dr. Dunne's testimony as to which bullet killed which victim.

Defendant was charged with the purposeful and knowing murder of Gallara by his own conduct. The prosecutor relied upon Dr. Dunne's testimony to support its assertion that the defendant intended to kill Gallara and fired aiming to hit Gallara.

As already noted, it was defendant's theory that he only shot at the dashboard to show Koskovich that he was being supportive and did not aim or hit either victim. The position of Gallara's head at the time he was struck by the fatal bullet was relevant to the issue of whose bullet killed him, and defendant asserts he was impermissibly prevented from fully developing the contradictions in Dr. Dunne's testimony between the Koskovich trial and the present trial, along with an explanation as to why he changed it.

We find no abuse of discretion when the trial judge did not let defendant fully develop what occurred off the record during Dr. Dunne's testimony at the Koskovich trial. The Supreme Court addressed no issue regarding the testimony in affirming Koskovich's convictions, and while we recognize that the issues relating to the shooting and death of Gallara and the culpability of this defendant were different than those involving Koskovich, Dr. Dunne was subject to considerable and lengthy cross-examination with respect to his testimony in this trial and inconsistencies with his testimony in the Koskovich case. There was no limitation imposed on the development of Dunne's prior testimony and claimed inconsistent statements.

*State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).

As previously stated, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." U.S. Const. Amend. VI. The right is secured for defendants in state as well as federal criminal proceedings by the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. at 403. The protections of the Confrontation Clause necessarily include the right to cross-examination of a witness. *See Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). The scope of such cross-examination is, generally, that broad and basic information cannot be excluded; for instance, where credibility is at issue, the trial court cannot ordinarily prohibit the defense from inquiring into a witness's identity and residence. *See id.* Such questions are "not only an appropriate preliminary to the cross-examination of the

witness, but ... [are] an essential step in identifying the witness with his environment, to which cross-examination may always be directed."   *Id.* at 132 (quoting *Alford v. United States*, 282 U.S. 687, 693, 51 S.Ct. 218, 75 L.Ed. 624 (1931)).   In other words, defense must be able "to make a record from which to argue [that the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial."   *Id.*

However, the right to cross-examination is not without limits, as "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."   *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).   Thus, the scope of cross-examination regarding a particular line of inquiry falls necessarily "within the sound discretion of the trial court," and "it may exercise a reasonable judgment in determining when [a] subject is [inappropriate]."   *Alford*, 282 U.S. at 694.   "[T]rial judges retain wide latitude ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant."   *Delaware v. Van Arsdall*, 475 U.S. 673, 679,106 S.Ct. 1431 (1986).

The trial court limited the questioning of Dr. Dunne with regard to why he changed his testimony in the Koskovich trial and what occurred during breaks in that trial, but trial counsel was permitted, and did so very thoroughly, to cross examine Dr. Dunne regarding the alleged inconsistencies in his testimony.   As stated by the Appellate Division, there was no limitation imposed on the development of Dr. Dunne's prior testimony and claimed inconsistent statements. Petitioner's Sixth Amendment rights were not violated and the state court ruling was not contrary

22

to, and did not involve an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts presented in the state court proceedings. Accordingly, this ground for habeas relief is denied.

### e.   Tape Player

Petitioner argues that it was a denial of his "right to a fair public trial" when the trial court allowed the jury to have a tape player during deliberations so they could listen to Petitioner's recorded statement.   This argument was also denied by the Appellate Division:

> Defendant argues that the jury should not have use of the tape player to replay defendant's recorded statement in the jury room.   *Cf. State v. Brown*, 362 N.J. Super. 180 (App. Div. 2003) (involving read back of the victim's testimony).   But the tape was introduced into evidence, and we cannot see a basis for reversal in the absence of some adverse impact or something showing of prejudice.   *See State v. Castellanos*, 935 P.2d 1353, 1357 (Wash. 1997) (no abuse of discretion when tapes of 'non-testimonial' recordings of drug transaction and playback equipment left with jury during deliberations).

*State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).

 "Federal habeas corpus relief does not lie for errors of state law," *Estelle*, 502 U.S. at 67, such as evidentiary rulings, unless the rulings rendered the trial so fundamentally unfair that a denial of constitutional rights results.   The admission of evidence violates due process only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness.   However, courts "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990).   Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."   *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996).   Thus, unless Petitioner can demonstrate that the introduction of this evidence denied him

his right to a fair trial or due process, habeas relief is not warranted.

Here, Petitioner has failed to meet said burden.   To allow the jury to have the tape, which had properly been admitted into evidence, without providing the tape player would have rendered the tape useless.   Moreover, the jury had already heard the tape played in the courtroom.   It is clear that Petitioner was not denied his right to a fair trial or due process.   *See Kunco v. Attorney Gen. of Commonwealth of Pa.*, 85 F. App'x 819, 820.   As such, the Court finds that the state court ruling was not contrary to, and did not involve an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts presented in the state court proceedings.   This ground for habeas relief is denied.

### f.  Prosecutor's Comments

On direct appeal, Petitioner argued that it was a violation of his rights when the prosecutor suggested that the jury view the evidence "through the terror stricken eyes of the two victims" in his closing argument.   Petitioner also argues that the prosecutor indirectly commented on Petitioner's decision not to testify.[1]

When reviewing a prosecutor's comments in an opening or closing statement, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).   In evaluating the likely effect of improper comments, a court may consider whether the improper comments were invited by or responsive to prior comments by opposing counsel.   *Darden*, 477 U.S. at 181–82.   Thus, "Supreme Court precedent counsels that the reviewing court must examine the prosecutor's

---

[1] It appears that the Appellate Division determined that this argument was without sufficient merit to warrant discussion in a written opinion.   N.J. Court R. 2:11-3(e)(2).

offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."   *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Based on a careful review of the entire trial record, this Court finds that the prosecutor's statements during closing arguments did not have the capacity to so infect the trial with unfairness as to make the resulting conviction a denial of due process.   In his closing argument, the prosecutor stated the following:

> Recall how in his opening statement, again the remarks he just made to you, [defense counsel] suggested that you view the facts this matter through the eyes of a 17 year old. I suggest that you focus on the facts clearly and directly with your own eyes, and if you feel inclined to look at the evidence through the eyes of someone else, I would suggest that you view them from the depths of the terror-stricken eyes of the two victims in this matter, Jeremy Giordano an [sic] Giorgio Gallara, in the instant before they were killed.

(Resp'ts' Br., Ex. 26T, Trial Tr. 61:17-62:1, Dec. 20, 1999, ECF No. 18-10.)   Trial counsel did not object to this statement.

Also in his closing argument, the prosecutor referenced Petitioner's statement to the police by stating that "defendant did testify through Lieutenant Rome of his purposeful involvement of this murder, robbing of two individuals, burglarizing their vehicle, and then trying to cover it up and escape detection."   (*Id.* at 93:14-25.)   After trial counsel voiced concern that the prosecutor had improperly referenced Petitioner's testimonial silence, the trial court determined that any possible prejudice would be alleviated by the court's instruction in the final charge that Petitioner had the right not to testify and that the jury should not draw any adverse inference from that.   (*Id.* at 100:3; 18-20.)   Trial counsel agreed that the instruction would suffice.

The trial court instructed the jury that Petitioner had a "constitutional right . . . to remain

silent" and that they could not consider "for purposes or in any manner in arriving at your verdict the fact that the defendant did not testify, nor should the fact entered into your deliberations or discussions in any manner at any time." (*Id.* at 112:1-8.) The trial court further instructed the jury that arguments of counsel "are not evidence and must not be treated as evidence." (*Id.* at 10:10-18;107:12-25.)

Here, it is clear that the prosecutor's comments were not improper. Moreover, even if the comments were to be found improper, any impropriety was alleviated by the trial court's instructions to the jury. *See Moore*, 255 F.3d at 107. Petitioner has not shown that his rights were violated and the Court finds no error of constitutional dimension with respect to Petitioner's claim of prosecutorial misconduct. Accordingly, this ground for habeas relief is denied.

### g. Sentencing and Merger Issues

Petitioner raised several issues regarding his sentence and merger of convictions on direct appeal.

Sentencing is generally considered a matter of state criminal procedure, which does not fall within the purview of federal habeas review. *See Grecco v. O'Lone*, 661 F.Supp. 408, 415 (D.N.J. 1987). Absent some constitutional violation, federal courts cannot review a state's alleged failure to adhere to its own sentencing procedure. *See Rorie v. Beard*, 2005 U.S. Dist. LEXIS 23813 (E.D. Pa. April 7, 2005) (citing *Branan v. Booth*, 861 F.2d 1507 (11th Cir. 1988)). Thus, a federal court will not re-evaluate a sentence in a habeas proceeding unless it exceeds the relevant statutory limits. *See Jones v. Superintendent of Rahway State Prison*, 725 F.2d 40 (3d Cir. 1984); *see also Williams v. Duckworth*, 738 F.2d 828, 831 (7th Cir. 1984) ("As a general rule, federal courts will not review state sentencing determinations that fall within statutory limits"). Moreover, federal

courts will not interfere with a state's sentencing scheme unless the petitioner can show that no reasonable sentencing court would have invoked the same relevant considerations to justify imposition of such sentence.   *See Lewis v. Jeffers*, 497 U.S. 764, 783, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).   "While normal sentencing proceedings are not immune from all due process attacks, the Supreme Court has required only minimal due process protections in those proceedings." *United States v. Davis*, 710 F.2d 104, 106 (3d Cir.1983) (citations omitted).

Here, Petitioner failed to demonstrate that his sentence violates any federal constitutional rights.   Moreover, his individual sentences or their aggregated total did not exceed the relevant statutory limits, nor could these sentences shock the judicial conscience.   *Accord Harris v. United States*, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002); *Wainwright v. Goode*, 464 U.S. 78, 84, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983). The state courts' determinations were wholly reasonable and by no means arbitrary; and, if the Court were to presume that any state law errors took place, these state law aspects form no basis for habeas relief.[5]

### 2.  Ineffective Assistance of Counsel

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.   The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.   *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has

---

[5] The Appellate Division partially granted Petitioner's claim on appeal, finding that the consecutive sentences imposed for the murder of Gallara, the aggravated manslaughter of Giordano and the armed robbery and resulting aggregate sentence of life plus thirty-five years was sustained, but the court ordered that the remaining sentences were to run concurrently.   *State v. Vreeland*, A-1219-00T4 (N.J. Super. Ct. App. Div. Jan. 21, 2005).

two components, both of which must be satisfied.  *See Strickland*, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  *Id*. at 687-88.  "[C]ounsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011)(citing *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052).  "To overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'"  *Id.* (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052).

Further, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id.* at 690.  The court must then determine whether, in light of all the circumstances at the time, the identified errors were so serious that they were outside the wide range of professionally competent assistance.  *Id.*

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id*. at 695.   "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding'...Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011)(citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).   As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have

been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.

The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  *Strickland*, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

### a.  Right to Testify at Waiver Hearing

Petitioner alleges that his trial counsel was ineffective for failing to protect Petitioner's right to testify at the juvenile waiver hearing that occurred in state court on June 2, 1997.  When denying this issue on PCR appeal, the Appellate Division stated the following:

> There was an extensive voir dire of defendant and his mother concerning his right to testify during the juvenile waiver proceeding. He was told of the immunity which would accompany such testimony, but expressly advised the court that he decided not to do so because his testimony would be released to the press. In any event, given the nature of the "chart one" offense charged and a juvenile waiver proceeding in a murder case, we cannot conceive that the result of the waiver hearing would have been any different had defendant testified or contested the waiver. *See State v. Scott*, 141 N.J. 457, 471-72 (1995); *State v. R.G.D.*, 108 N.J. 1, 9-15 (1987); *State v. Onque*, 290 N.J.Super. 578, 586 (App.Div.), *certif. denied*, 146 N.J. 497 (1996); *State v. S.M.*, 211 N.J.Super. 675, 684-85 (App.Div.1987). *See also Strickland v. Washington*, 466 U.S. 668, 687, 699, 104 S.Ct. 2052, 2064, 2071-72, 80 L. Ed.2d 674, 692, 701 (1984); *State v. Fritz*, 105 N.J. 42, 58 (1987).

*State v. Vreeland*, 2010 WL 2990937, at *2 (N.J. Super. Ct. App. Div. July 26, 2010).

At the waiver hearing, the state court judge specifically reviewed Petitioner's rights with him, to ensure that Petitioner was fully aware of his right to testify.  (Resp'ts' Br., Ex. 1T, Waiver Hr'g Tr.121:1-122:3, ECF No. 17-2.)  The judge also asked Petitioner if his attorney had

29

answered all of his questions and whether Petitioner was satisfied with the work of his attorney.

(*Id.* at 123:12-17.)   Trial counsel himself also questioned Petitioner about this issue on the record:

> COUNSEL: Okay. Prior to today's hearing, we had met for the purpose of you testifying in this hearing. Is that correct?
>
> PETITIONER: Yes.
>
> COUNSEL: And you had indicated to me that you did wish in fact to testify at this hearing. Correct?
>
> PETITIONER: Yes.
>
> COUNSEL: And I told you that you would receive immunity with regard to that testimony. Correct?
>
> PETITIONER: Yes.
>
> COUNSEL: Now, this morning when we first met, you had additional questions for me as to whether or not the press would be allowed into the hearing and be allowed to release your testimony. Is that correct?
>
> PETITIONER: Yes.
>
> COUNSEL: And you have chosen as a result of the fact then press would be allowed to release anything that you testified to in this hearing, you have now indicated to me that you do not wish to testify at this time. Is that correct?
>
> PETITIONER: Yes.
>
> COUNSEL: Do you have any questions of either myself or the Court regarding any of these issues?
>
> PETITIONER: No.

(*Id*. at 124:23-125:20.)

As stated by the Appellate Division, it is clear that both Petitioner and his mother were extensively questioned and advised by the state court regarding Petitioner's rights at the hearing. Petitioner was questioned on the record by counsel regarding his decision not to testify and it is

clear that he understood his rights.   Moreover, even if this Court were to assume that Petitioner

had met the first *Strickland* prong, Petitioner has not established any prejudice that resulted from

the alleged ineffective assistance.

The state courts' decision on this issue was not contrary to, and did not involve an

unreasonable application of, clearly established federal law; nor was it based on an unreasonable

determination of the facts presented in the state court proceedings.   Therefore, Petitioner is not

entitled to relief on this claim.

### b.  Presence During Charge Conference

Petitioner argues that his trial counsel was ineffective when he failed to protect Petitioner's

right to be present during the charge conference.      In rejecting this argument, the PCR court stated

the following:

> Other argument raised had to do with the defendant not being present at the jury
> charge conference, that was raised on appeal.   There have been certain decisions in
> that area since the time of the trial, and the defense has argued that those decisions
> create a basis for relief.   What had happened is that there was a discussion, in the
> defendant's presence of the fact that there was going to be a charge conference, and
> the question was raised whether or not the desire to be present for all of it.
>
> It's frequently the practice that the attorneys will participate in a charge conference,
> and a defendant can waive and forego his presence.
>
> Here, if you look through the sequence, and it's mostly contained in the transcripts
> of December 15th, and December 16th, 1999, of the trial.... Judge Parker explains in
> detail to Mr. Vreeland the way in which charge conferences work.   And that's a
> quote from Page 186.
>
> On Page 188, the Judge says: You, however, have the option of saying you wish to
> be present for the entire charge conference.   If you wish to do so, we will have the
> entire conference here in the courtroom.
>
> So if you look at Pages 186 through 188, a fairly detailed menu of options was laid
> out for Mr. Vreeland.
>
> ...The transcript of the next date, December 16th, 1999, on Page 53, at Line 24,

31

actually trial counsel says: It's my understanding, Judge, my client does not wish to be present during the charge conference.   However, Judge, I believe Mr. Briegal and I would like to address some quick issues with you initially now.

Then goes on to talk about some logistics of transportation.

The point being that there was on two consecutive days consideration of presence at the charge conference.   And the defendant acquiesced in the procedures that his attorney and the judge and the Prosecutor had made to deal with the very complicated charge.

(Resp'ts' Br., Ex. 31T, PCR Hr'g Tr. 49:4-50:21, Aug. 7, 2007, ECF No. 18-15.)

As stated by the PCR court, it is clear that the possibility that Petitioner be present at the charge conference was discussed on the record by the state court.   The court and counsel discussed the planned course of action in the presence of Petitioner and Petitioner did not voice any objection to counsel's statement that he believed Petitioner did not wish to participate in the conference.   Moreover, even if this Court were to assume that Petitioner had met the first *Strickland* prong, Petitioner has not established any prejudice that resulted from the alleged ineffective assistance.

The state courts' decision on this issue was not contrary to, and did not involve an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts presented in the state court proceedings.   Therefore, Petitioner is not entitled to relief on this claim.

### c.  Failure to Call Witnesses

Petitioner alleges that his trial counsel was ineffective for failing to call two witnesses who could have impeached the testimony of Charles Varella.   The Appellate Division rejected this argument on PCR appeal, stating:

Similarly, there is no showing of what inmates would have said in an endeavor to impeach the testimony of defendant's cellmate Charles Varella. His argument about

32

the failure to call those inmates is that "counsel's failure to produce as witnesses the three inmates from whom written statements had been secured was ineffective assistance of counsel because their testimony would have impeached the credibility of Varella." For this proposition defendant cites his own letter to Judge Critchley, that, but for the ineffective assistance in not calling these witnesses, he would have been able to impeach Varella. Defense counsel apparently obtained statements from witnesses that Varella was working with the prosecutor's office, but there are no certifications from any of the witnesses for the PCR as to what their testimony would have been at a trial. Moreover, as Judge Critchley stated in his PCR opinion, calling such witnesses "might very well trigger additional counter cross examination that would just completely reamplify and rechurn the fact that the defendant had apparently in several contexts given very damning admissions," and had given similar oral and recorded statements to the police. In any event, as the judge put it, even if counsel erred in not calling these witnesses, it would not "have changed the result in this case one iota."

*State v. Vreeland*, 2010 WL 2990937, at * 2 (N.J. Super. Ct. App. Div. July 26, 2010).

The state courts' decision on this issue was not contrary to, and did not involve an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts presented in the state court proceedings. Petitioner failed to establish what testimony the two witnesses would have supplied and that it would have helped his case in any way. Petitioner is not entitled to relief on this claim.

### d.  Jury Instructions

In his PCR appeal, Petitioner argued that it was ineffective assistance of counsel when trial counsel failed to object to the court's instruction on motive. Specifically, when the court instructed that "a homicide or killing with a deadly weapon, such as a handgun, in itself would permit you to draw an inference that the defendant's purpose was to take a life or cause serious bodily injury resulting in death." (Resp'ts' Br., Ex. 26T, Trial Tr. 120:2-6, Dec. 20, 1999, ECF No. 18-10.)

In denying this argument on PCR, the court stated the following:

There's a complaint by the defendant that the jury charge included an instruction

that a jury could draw an inference regarding state of mind or intention or purpose from the fact that a deadly weapon was used.  That is a standard charge.  The jurors are always told they can consider an instrumentality of an assault or homicide as perhaps forming the basis to draw an inference regarding a defendant's purpose.   So, there is nothing in the *pro se* petition that strikes me as being an error generally.   And even assuming arguendo it was an error, that is an error that could have changed the results in this case, and again that goes back to the fact that this conviction which was entered by a jury, affirmed by the Appellate Division was based on compelling and overwhelming evidence.

(Resp'ts' Br., Ex. 31T, PCR H'rg Tr. 38:2-16, Aug. 7, 2007, ECF No. 18-15.)

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief.  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution..."Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

*Estelle*, 502 U.S. at 72–73 (citations omitted).  Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  *Smith v. Horn*, 120 F.3d 400, 416 (1997).  *See also In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); *Sandstrom v. Montana*, 442 U.S. 510, 523, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the

accused).

In *Waddington v. Sarausad*, 555 U.S. 179, 129 S.Ct. 823, 172 L.Ed.2d 532 (2009), the Supreme Court rejected a habeas petitioner's claim that an accomplice liability instruction violated due process. The Court summarized the law regarding the constitutionality of state court instructions:

> Even if there is some ambiguity, inconsistency, or deficiency in the instruction, such an error does not necessarily constitute a due process violation. Rather, the defendant must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.  In making this determination, the jury instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  Because it is not enough that there is some slight possibility that the jury misapplied the instruction . . . the pertinent question is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.

*Waddington*, 129 S.Ct. at 831–832 (2009) (citations and internal quotation marks omitted).

Here, Petitioner does not show that there was a reasonable likelihood that the jury applied the instructions in a way that relieved the state of its burden of proving the elements of the charged crimes or required state of mind.  Even if this Court were to assume that the instruction was deficient in some way, it certainly did not "so infect" the trial such that the resulting conviction violates due process.   As such, it was not ineffective assistance when trial counsel failed to object to said instruction.  Because Petitioner has not shown that the state courts' adjudication of his claim was contrary to, or an unreasonable application of Supreme Court precedent, he is not entitled to habeas relief on this ground.

### e. Appellate Counsel

Petitioner argues that appellate counsel rendered ineffective assistance when he failed to raise the change of venue issue on direct appeal.

In denying this ground for relief on PCR appeal, the Appellate Division stated the following:

> We will also assume, for the sake of argument, that appellate counsel should have raised the change of venue issue on the direct appeal, but do not accept defendant's contention that we would have reversed any conviction based on the denial of a change of venue or that such a change would have resulted in a different verdict. Judge Reginald Stanton denied a motion for change of venue twice, once before and once after the capital trial of co-defendant Koskovich, and Judge Lorraine Parker, who presided over the trial, conducted an extensive individual voir dire of prospective jurors, including the issue of pretrial publicity or knowledge of the case, when the jury was selected. She excused jurors during the voir dire to assure a fair and impartial jury. Moreover, defendant points to absolutely nothing in the record about any sitting or deliberating juror who should have been excused because of an inability to be fair or impartial.   Judge Stanton in denying the motion for change of venue indicated the trial would be moved from Sussex to Morris County if the jury selection revealed defendant could not receive a fair and impartial jury in Sussex. Accordingly, if the change of venue issue were raised on the direct appeal, it undoubtedly would have been rejected as unmeritorious. *See State v. Harris*, 156 N.J. 122, 164-68 (1998) (pretrial publicity can be cured by a proper voir dire), *cert. denied*, 532 U.S. 1057, 121 S.Ct. 2204, 149 L. Ed.2d 1034 (2001); *State v. List*, 270 N.J.Super. 169, 175 (App.Div.), *certif. denied*, 134 N.J. 486 (1993) (same); *State v. Halsey*, 218 N.J.Super. 149, 158-59 (Law.Div.1987) (same). In this connection, while the death penalty of co-defendant Koskovich was vacated, his conviction was affirmed. *State v. Koskovich*, 168 N.J. 448, 474, 541-42 (2001).   Moreover, the main defense at trial related to defendant's capacity and lack of intent to commit a purposeful or knowing murder, not that he was wrongly identified as a perpetrator.

*State v. Vreeland*, 2010 WL 2990937, at * 3 (N.J. Super. App. Div. July 26, 2010).

Here, the Appellate Division correctly determined the governing Supreme Court precedent.   The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, the *Strickland* standard.   Nor was the decision of the Appellate Division based on

an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Petitioner has failed to establish a reasonable probability that but for any alleged deficiencies in appellate counsel's performance, the outcome would have been different. The state courts specifically found that the trial court conducted an extensive voir dire and there is nothing in the record to suggest that a sitting juror should have been dismissed based on his or her inability to be fair or impartial. Petitioner presented no evidence to suggest that a change of venue was warranted. Moreover, even assuming Petitioner met the first prong of *Strickland*, the Appellate Division explicitly found that there was no prejudice as the change of venue issue would have been rejected as unmeritorious on direct appeal. As such, habeas relief on this ground is hereby denied.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. No certificate of appealability shall issue.

## IV.  CONCLUSION

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability will not issue.   An appropriate Order follows.

DATED: May 1, 2013

/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge